1          **UNITED STATES DISTRICT COURT**
           **WESTERN DISTRICT OF NEW YORK**
2

3   UNITED STATES OF AMERICA,        )
                                     ) Case No. 1:23-CR-00109
4                                    )          (JLS)(MJR)
                  Plaintiff,         )
5                                    )
    vs.                              ) June 18th, 2025
6                                    ) 10:37 a.m.
    ROBERTO HERNANDEZ,               )
7                                    )
                  Defendant.         )
8

9          **TRANSCRIPT OF EVIDENTIARY HEARING**
        **BEFORE THE HONORABLE MICHAEL J. ROEMER**
10         **UNITED STATES MAGISTRATE JUDGE**

11

12  <u>APPEARANCES</u>:

13  For the Plaintiff:   MICHAEL DIGIACOMO
                         UNITED STATES ATTORNEY
14                       BY:  CAITLIN HIGGINS, ESQ.
                         ASSISTANT UNITED STATES ATTORNEY
15                       138 Delaware Avenue
                         Buffalo, NY 14202
16
    For the Defendant:   JUDITH M. KUBINIEC, ESQ.
17                       402 Amherst St.
                         Buffalo, NY 14207
18
    Audio Recorder:      ROSALIE ZAVARELLA
19
    Transcriber:         MEGAN E. PELKA, RPR
20                       Robert H. Jackson US Courthouse
                         2 Niagara Square
21                       Buffalo, NY 14202
                         Meganstranscripts@gmail.com
22

23          Proceedings recorded with electronic sound recording,
    transcript prepared with computer-aided transcription.

24

25

1              THE CLERK:  The United States District Court for the

2     Western District of New York is now in session.  The Honorable

3     Michael J. Roemer presiding.  We're here on the matter of USA

4     vs. Robert Hernandez, case number 23-CR-109, for an

5     evidentiary hearing.  Counsel for the government, please state

6     your name for the record.

7              MS. HIGGINS:  Good morning, Judge.  Caitlin Higgins

8     on behalf of the government.

9              THE CLERK:  Thank you.  Counsel for defendant, please

10    state your name for the record.

11             MS. KUBINIEC:  Judith Kubiniec.

12             THE COURT:  Thank you.  And I'd note defendant is

13    present in the courtroom and also present is our interpreter,

14    Raida Pimienta.  Ms. Pimienta, if I may swear you in?

15    (The interpreter was sworn at 10:39 a.m.)

16             THE CLERK:  Thank you.

17             THE COURT:  Good morning.  We're here for an

18    evidentiary hearing.  Ms. Pimienta, you've appeared before in

19    this case?

20             INTERPRETER:  Yes.

21             THE COURT:  The defendant understands you?

22             INTERPRETER:  Yes.

23             THE COURT:  And you understand him?

24             INTERPRETER:  Yes.

25             THE COURT:  Thank you so much.

US v. HERNANDEZ -- 06/18/2025 -- EVIDENTIARY HEARING

2

1            INTERPRETER:  You're welcome.

2            THE COURT:  Ms. Higgins, you want to call your first

3    witness?  Before I do, you know, I have these hearings.  At

4    the beginning, we spend ten minutes going through the

5    officers' experience.  Can we, kind of, cut to the chase and

6    get by that?

7            MS. HIGGINS:  Yeah, Judge.  I'll keep the background

8    very limited, basically just so -- I'm cognizant of that but,

9    before we do, I just have a quick housekeeping matter.

10            THE COURT:  Sure.

11            MS. HIGGINS:  So, one, just confirming the scope

12    because -- so, I want to make sure that I am understanding

13    Your Honor's delineation of the scope of this hearing.

14        The first is that Your Honor has already said that defense

15    counsel, and the defendant, cannot challenge the probable

16    cause in the ping warrant.  And so, I just want to make sure

17    that I am confirming my understanding of that and that is

18    accurate.

19            THE COURT:  I'll decide that on the papers.

20            MS. HIGGINS:  Yes.  Thank you, Judge.

21        Second was, we are addressing the car stop, but the

22    specific issue, as I recall it, Judge, was whether it was

23    raining the day that the -- at the time that the stop was

24    effectuated, which would have supported the traffic

25    infraction.  Am I correct in understanding that?

1           THE COURT:  Well, I would maybe be a little broader.

2   The legitimacy of the car stop.

3           MS. HIGGINS:  Okay, Judge.  Thank you.

4           THE COURT:  Your guy says it was raining.  He says it

5   wasn't raining.

6           MS. HIGGINS:  Correct.  Yes.  And that's a better way

7   to phrase it, Judge.  Thank you.

8       And third, the K-9 affidavit.  Defense counsel raised the

9   fact that the date of the signature on that affidavit didn't

10  make sense, so we have the K-9 officer here who can testify

11  about that.  I want to confirm that that's the scope of the

12  K-9 inquiry about the date issue.

13      And then, finally, the search warrant for the affidavit --

14  the search warrant, excuse me, for the Honda Odyssey, Judge.

15  We have the officer here who drafted that, and I want to just

16  raise an issue with that, Judge.  We disclosed, in November of

17  2023, my predecessor on the case did, that there was an error

18  in the recitation of the probable cause.  So, we disclosed

19  that to the defense at the time, of course they didn't have

20  the affidavit, so we didn't disclose what that was.

21      In preparation for this hearing yesterday, I alerted

22  defense counsel to what the specific error was in that

23  affidavit, and I've disclosed the fully unredacted copy of the

24  affidavit.  So I just want to make sure, and I will obviously

25  be addressing that with the officer on the stand, but I didn't

1    want Your Honor to hear that for the first time when he's

2    testifying.

3              THE COURT:  Okay.

4              MS. HIGGINS:  And, Judge, I think that is it from me.

5    I'm trying to be brief in defining the scope, so thank you for

6    allowing me to do that.

7              THE COURT:  Anything you want to say Ms. Kubiniec?

8              MS. KUBINIEC:  Your Honor, it was not my

9    understanding that the -- with regard to the K-9, just so I

10   understand, the K-9 affidavit is not just restricted to the

11   issue of that date; is that correct?  I can ask other --

12             THE COURT:  You can ask whatever you want about it.

13             MS. KUBINIEC:  Okay.  That's --

14             THE COURT:  Okay.  We won't get finished until we get

15   started, okay?  So, let's get your --

16             MS. HIGGINS:  We're ready, Judge.  The government is

17   going to call Sergeant Joseph Reeves first.

18   (The witness was sworn at 10:43 a.m.)

19             THE WITNESS:  Joseph Reeves, J-O-S-E-P-H,

20   R-E-E-V-E-S.

21             MS. HIGGINS:  Judge, may I?

22             THE COURT:  Sure.

23             MS. HIGGINS:  Thank you.

24

25

1                              DIRECT EXAMINATION

2

3    BY MS. HIGGINS:

4    Q.   Good morning, Sergeant Reeves.  How are you employed?

5    A.   I am employed by the Erie County Sheriff's Office, Police

6    Services Division.

7    Q.   And how long have been employed by the Erie County

8    Sheriff's Office?

9    A.   Approximately seven and a half years.

10   Q.   During your career at the Erie County Sheriff's Office,

11   did you receive training?

12   A.   I have.

13   Q.   Can you describe, in summary, what types of training

14   you've have received?

15   A.   A number of training to include firearms training, in-

16   service training every year.

17   Q.   Have you received training with respect to narcotics

18   investigations?

19   A.   I have.

20   Q.   Are you currently assigned to a certain unit or group?

21   A.   I am.

22   Q.   And what is that unit?

23   A.   Currently, I'm the sergeant in charge of the Community

24   Engagement Team.

25   Q.   In April 2023, what unit or group were you assigned to?

1    A.   I was assigned to the Narcotics and Intelligence Unit.

2    Q.   What were your responsibilities and duties in that group?

3    A.   They ranged.  I was part of the GAM (phonetic) initiative

4    as well as a uniformed, marked patrol unit for Narcotics to

5    assist with investigations.

6    Q.   So, is it fair to say that, in your experience in that

7    unit, you have experience in conducting narcotics-related

8    traffic stops?

9    A.   Yes.

10   Q.   I want to direct your attention to April 28th, 2023.  Do

11   you recall that you were working that day?

12   A.   Yes, I was.

13   Q.   Did you participate in a traffic stop on the I-90

14   westbound?

15   A.   Yes, I did.

16   Q.   Can you explain --

17          THE COURT:  Ms. Higgins can I ask you to just keep

18   your voice up a little bit?

19          MS. HIGGINS:  Oh, I'm sorry, Judge.

20          THE COURT:  There's the translating going on at the

21   same time and I'm having a little difficulty.

22          MS. HIGGINS:  Yes.  I'll do that, Judge.  Thank you

23   for reminding me.

24   BY MS. HIGGINS:

25   Q.   How did that traffic stop originate?

1   A.  I was contacted by a fellow employee from the sheriff's

2   office, Deputy Granville, regarding a vehicle that could

3   possibly have been transporting narcotics and he was looking

4   for us to -- myself to participate in a traffic stop if I

5   could.

6   Q.  And how did Deputy Granville communicate that information

7   to you; in person, phone call?

8   A.  Called me by phone.

9   Q.  Called you?  And you just testified that he asked you to

10  participate or assist --

11          MS. KUBINIEC:  Objection, Your Honor.  She's leading

12  massively.

13          THE COURT:  Overruled.  Go ahead.

14  BY MS. HIGGINS:

15  Q.  You just testified that you participated in assisting

16  this traffic stop; is that correct?

17  A.  Yes.

18  Q.  What information, if any, did Deputy Granville share with

19  you about the proposed traffic stop?

20          MS. KUBINIEC:  Objection, Your Honor.  Same.

21          THE COURT:  Overruled.  Go ahead.

22          THE WITNESS:  I was informed that there was a

23  vehicle.  I was given a description of a black Honda Odyssey

24  minivan that was traveling from the New York City area and

25  possibly had narcotics in the vehicle that was being

1    transported to Erie County.

2    Q.  And what, if any, directive did Deputy Granville give you

3    with respect to this vehicle?

4    A.  He just told me that if we were able to locate the

5    vehicle, and if we had probable cause to initiate a traffic

6    stop to initiate the traffic stop and, you know, talk to the

7    occupant and see what occurred from there.

8    Q.  Once you received that information from Deputy Granville,

9    what did you do?

10   A.  I partnered up with another deputy, Deputy Szkatulski,

11   who was a K-9 handler for the sheriff's office and we call it

12   doubled up.  We both got into -- I was the passenger in his

13   marked patrol vehicle, and he was the driver, and we went out

14   to the 90 in the Clarence area near the rest stop on the 90

15   westbound there and parked in a turnaround.

16   Q.  Were you in contact with Deputy Granville or any federal

17   counterparts during that day?

18   A.  Yes.  I was in contact with Deputy Granville throughout

19   on -- multiple times by phone.

20   Q.  And did that include before the stop?

21   A.  Yes.

22   Q.  Did that include after the stop?

23   A.  Yes.

24   Q.  And were you in communication -- I'm sorry if I didn't

25   hear you -- via phone; is that correct?

 1    A.   Yes.

 2    Q.   What did you know, if anything, about other people being

 3    on the highway as part of this operation?

 4    A.   I knew that there were -- that Deputy Granville and other

 5    members of his investigative team were out conducting

 6    surveillance.  I was not aware of who else was out, just my

 7    communications were limited to Deputy Granville the -- for

 8    the entirety of the incident.

 9    Q.   At the time that you're parking, did you know whether

10    there was any tracking of this vehicle going on?

11    A.   I know the -- I wasn't made aware of any tracking per se.

12    I just know that they were visually surveilling the vehicle

13    or attempting to update the location as well.  When we first

14    pulled out there, the vehicle was quite a distance away at

15    that time, I believe.

16    Q.   Who communicated that to you?

17    A.   Deputy Granville.

18    Q.   And what other updates did you receive before the traffic

19    stop from Deputy Granville about the location of the car?

20         MS. KUBINIEC:  Objection, Your Honor.  She's leading

21    the witness.

22         THE COURT:  Overruled.  Go ahead.

23         THE WITNESS:  I received an update that the suspected

24    vehicle was passing the Pembroke Exit on the 90 and then I

25    received another update when the vehicle passed the rest stop

1    in Clarence.

2    BY MS. HIGGINS:

3    Q.   At a certain point, did you, yourself, observe a vehicle

4    that matched the description provided by Deputy Granville?

5    A.   Yes, I did.

6    Q.   What, if anything, did you observe about the vehicle?

7    A.   I observed the vehicle was traveling westbound.  It was

8    raining at the time, and the Honda minivan -- they were

9    operating their windshield wipers with no headlights

10   activated, which is a vehicle and traffic law violation.

11   Q.   As you sit here today, do you have an independent

12   recollection that it was raining on that day?

13   A.   Yes.

14   Q.   And what is that independent recollection?

15   A.   We were using our windshield wipers, so I know it was

16   raining.

17          MS. HIGGINS:  Judge, may I approach?

18          THE COURT:  Sure.

19   BY MS. HIGGINS:

20   Q.   Showing you what's been previously marked as Government

21   Exhibit 1, can you take a look at it, please?

22          MS. HIGGINS:  And, Judge, I'm confirming you

23   received the binder with our exhibits.  Thank you, Judge.

24   And I provided it to defense counsel as well.

25

1   BY MS. HIGGINS:

2   Q.   Let me know when you're done.

3   A.   Okay.

4   Q.   Do you recognize this document?

5   A.   I do.

6   Q.   What is it?

7   A.   It is a uniform traffic ticket.

8   Q.   Have you seen this document before testifying today?

9   A.   Yes.

10  Q.   Do you see your name and signature on the document?

11  A.   Yes.

12  Q.   Did you prepare this uniform traffic ticket?

13  A.   Yes.

14        MS. HIGGINS:  At this time, Judge, the government

15  moves to admit Government Exhibit 1 into evidence.

16        MS. KUBINIEC:  No objection.

17        THE COURT:  Government Exhibit 1 shall be admitted

18  into evidence.

19  (Government Exhibit 1 was received in evidence.)

20

21        MS. HIGGINS:  Thank you.

22  BY MS. HIGGINS:

23  Q.   If we can just take a look at Government Exhibit 1?

24  Sergeant, can you identify the date and time for this ticket?

25  A.   Yes.  The date is April 28th, 2023, and the time is 3:19

1   p.m.

2   Q.  And what's the description of the violation?

3   A.  No headlamps.  Inclement.

4   Q.  You can set that aside now.  Thank you.  Once you

5   observed the vehicle committing this traffic violation, what,

6   if anything, did you do?

7   A.  So, when the vehicle passed us, we pulled out, initiated

8   a traffic stop.  The operator of the vehicle pulled over to

9   the shoulder.  As I was in the passenger seat of the patrol

10  car, I approached the passenger side of the van.  My partner

11  approached the driver side of the van.  My partner asked the

12  driver to exit the vehicle and speak to him over on the

13  shoulder and I stayed and spoke to the passenger while he

14  remained seated in the front passenger side of the vehicle.

15  Q.  Now, when you approached the vehicle, when you got out of

16  the car and approached the vehicle, how many occupants did

17  you see in the car?

18  A.  Two.

19  Q.  Where were they both seated?

20  A.  One in the driver, front driver seat, and one in the

21  front passenger seat.

22  Q.  And you just testified that your partner asked the driver

23  to step out and talk to him on the shoulder; is that correct?

24  A.  Correct.  Yes.

25  Q.  Is it your training and experience to typically separate

1    occupants in a vehicle?

2    A.    Yes.

3    Q.    Why?

4    A.    For purposes of interviewing.  Obviously, we like to

5    separate them to make sure that we can speak to them

6    individually so that any questions, you know, they're not --

7    they don't get to hear what each person is saying.  So, we

8    separate them for that reason and asking the driver to exit

9    the vehicle is a common practice for safety reasons beyond

10   just interviewing technique.

11           MS. HIGGINS:  Judge, may I approach?

12           THE COURT:  Sure.

13   BY MS. HIGGINS:

14   Q.    Showing you what's been previously marked as Government

15   Exhibit 2.  Please take a look at that.  Do you recognize

16   this document?

17   A.    I do.

18   Q.    What is it?

19   A.    It is a police report.

20   Q.    Have you seen this document before testifying here today?

21   A.    I have.

22   Q.    Do you see your name on this document?

23   A.    I do.

24   Q.    And where is it?

25   A.    It's listed under the officers section and at the bottom

1    under the typist heading.

2    Q.  Did you prepare this document?

3    A.  I did.

4         MS. HIGGINS:  At this time, the government moves to

5    admit Government Exhibit 2 into evidence.

6         MS. KUBINIEC:  Foundation, Your Honor.

7         THE COURT:  Overruled.  Government Exhibit 2 will be

8    admitted into evidence.

9    (Government Exhibit 2 was received in evidence.)

10

11   BY MS. HIGGINS:

12   Q.  Now, I'd like to turn your attention now to the narrative

13   portion at the bottom of this exhibit.  Do you see the

14   narrative portion?

15   A.  Yes.

16   Q.  And if we go to the first paragraph of that, can you read

17   into the record the sentence that starts "The vehicle"?

18   A.  Sure.  The vehicle was being operated without two lighted

19   headlamps while utilizing windshield wipers due to rain.

20   Q.  And now, if you can go to the second paragraph, can you

21   read the sentence -- the first sentence of the second

22   paragraph that starts "Due to the weather"?

23   A.  Due to the weather conditions and speed of traffic,

24   Hernandez was asked to exit the vehicle to speak with Deputy

25   Szkatulski roadside.

 1   Q.  What does that phrase mean, due to the weather conditions

 2   and speed of traffic?  What does that mean?

 3   A.  So, typically, as I stated previously, for safety

 4   reasons, we're never -- it's common practice when traffic

 5   stops are conducted, especially on interstates or in traffic,

 6   vehicles are passing at a high rate of speed.  It's much

 7   safer for the driver and the deputy to speak off the side of

 8   the road.

 9       And the fact that it was raining, and the roads were

10   starting to get a bit slick, there have been multiple

11   incidents locally, as well as nationally, where deputies or

12   officers are hit by a passing vehicle.  So, we ask the driver

13   to speak with us in a safer location.

14   Q.  Based on your training and experience -- or I should

15   strike that.  Are you trained to assess the demeanor of

16   occupants in a car when you make a traffic stop?

17   A.  Yes.

18   Q.  Did you do so in this case?

19   A.  I did.

20   Q.  When did you do that?

21   A.  As soon as you make contact.  As soon as I made contact,

22   that's part of my assessment is, you know, to observe their

23   demeanor.

24   Q.  Did you observe the demeanor of the passenger when you

25   spoke to him?

1    A.  I did.

2    Q.  And what was the demeanor of the passenger?

3    A.  He appeared extremely nervous.  His -- I was able to see

4    his chest was rising and falling pretty rapidly.  As he spoke

5    to me, he -- his words were not clear.  He was clearly

6    nervous and, again, his breathing was very shallow and rapid,

7    which is indicative of somebody who is not in a comfortable

8    situation, who is nervous to be, you know, talking to me.

9    Q.  And did you make that assessment based on your training

10   and experience?

11   A.  I did.

12   Q.  Did you ask the passenger questions?

13   A.  I did.

14   Q.  What language did you speak to the passenger?

15   A.  In English.

16   Q.  Did the passenger answer your questions?

17   A.  He did.

18   Q.  What language did the passenger respond to your questions

19   in?

20   A.  In English.

21   Q.  What types of questions did you ask the passenger?

22   A.  I asked him where they were coming from, which he

23   stated -- I can't recall if he exactly -- but I knew it was

24   New York City area.  I don't recall if he said New York City

25   or a specific borough, but I asked him where they were

1    heading to.  He stated that they were going to Niagara Falls

2    to visit the driver's family.  I asked him how long they were

3    planning on staying.  He indicated to me that they intended

4    to staying for the whole following week.  This was a Friday

5    afternoon.  They were staying there for a week.

6        I asked him if they had made any stops.  I asked him what

7    time they left that morning.  He stated they left that

8    morning, I believe, in the 8:30 or so timeframe.  I asked him

9    if they had made any stops anywhere or if they just drove

10   straight through.  He indicated that they had driven straight

11   through; typical questions that I would ask, you know, on any

12   traffic stop where --

13   Q.  How long did that conversation last?

14   A.  It wasn't too long, maybe -- I can't be positive, but if

15   I estimate, a couple minutes; maybe three, four minutes.

16   Q.  And did I hear you correctly that you testified that

17   these were standard questions that you ask during a traffic

18   stop?

19   A.  Correct.

20   Q.  After you ended that conversation with the passenger,

21   what happened next?

22   A.  So, as I was speaking with the passenger, Deputy

23   Szkatulski was simultaneously speaking to the driver.  At

24   that point, Deputy Szkatulski sat back in the driver side of

25   the patrol vehicle.  The passenger window was down.  The

1  driver was still out of the vehicle and standing at the rear

2  of his Honda and Deputy Szkatulski and I just discussed -- he

3  asked similar questions to the driver and we discussed -- we

4  compared the answers to see.  And, at that point, we had

5  determined that there were several inconsistencies in their

6  answers.

7      Specifically, the driver stated they were only staying a

8  couple days.  He did not state that they were staying for a

9  whole week.  The driver stated that they had made a stop and

10  the passenger said they didn't stop.  So, there were a few

11  things that raised our suspicions at that point.  In my

12  training and experience, two occupants in a vehicle that had

13  been traveling for several hours together would know -- their

14  answers would not be different.

15  Q.  So, what happened next?

16  A.  So, at that point, based on the inconsistency in the

17  travel plans, Deputy Szkatulski, who was a K-9 handler, made

18  the determination to utilize his narcotics K-9 for an

19  exterior sniff on the vehicle.

20  Q.  Is that a standard procedure based on the facts of this

21  case where you had inconsistent stories?

22  A.  Yes.

23  Q.  What weight, if any, did you apply the fact that you knew

24  the vehicle may be transporting narcotics?

25  A.  That, obviously, was a large factor, not the only factor,

1   but was part of the totality of the circumstances.  Also,

2   that that is -- that route is a route normally taken from New

3   York City to this area where narcotics are trafficked.  It's

4   a known corridor that's utilized for that.

5   Q.  Based on the totality of the circumstances that you just

6   testified about, what happened next?

7   A.  So, we removed the passenger from the vehicle, because

8   the K-9 sniffs are not conducted with anybody inside the

9   vehicle, and the driver was placed into the rear of the

10  patrol car.  There's only one seat in that specific vehicle

11  for somebody because of the K-9 kennel.  And the passenger

12  stood off to the shoulder with myself while Deputy Szkatulski

13  removed his K-9 from his vehicle and conducted his exterior

14  sniff.

15  Q.  And what happened during the K-9 sniff?

16  A.  The dog, he -- I can't recall exactly which part of the

17  vehicle he started on, but once he got to the rear of the

18  van, in the area of this trunk seam or license plate area,

19  the dog did come to an indication in that area.

20  Q.  Now, based on your training and experience, when a dog

21  indicates during a K-9 sniff, are you able to then search a

22  vehicle?

23  A.  Yes.

24  Q.  Did you do so here?

25  A.  We did not.

1    Q.   What happened after the K-9 indicated on the vehicle?

2    A.   I informed Deputy Granville that we had a positive

3    indication.  He arrived on scene with multiple other unmarked

4    vehicles and, at that time, they transported -- I can't

5    recall exactly who.  I don't recall who did exactly what, but

6    the van was driven back to our office at 45 Elm Street in the

7    City of Buffalo.

8        We transported the driver back to the office and the

9    passenger was transported in one of the unmarked vehicles with

10   other investigators.  So, we left the scene on the 90 and all

11   of us went back to our office with the Honda.

12           MS. HIGGINS:  Judge, I have nothing further for this

13   witness.  Thank you.

14           THE COURT:  Ms. Kubiniec?

15

16                        CROSS-EXAMINATION

17

18   BY MS. KUBINIEC:

19   Q.   Deputy Reeves, I'm Judith Kubiniec.  I'm the attorney who

20   is representing Mr. Hernandez in this matter.  I just have a

21   few questions to follow up on the questions that have already

22   been asked of you.

23   A.   Sure.

24   Q.   You initiated this traffic stop; is that correct?

25   A.   I was in the vehicle as a passenger.  I was not operating

1   the patrol car, but I was in the vehicle as a second deputy.

2   Q.   Okay.  And where was your vehicle located when you

3   initiated -- when this traffic stop was initiated?

4   A.   The vehicle that we were in?

5   Q.   Correct.

6   A.   Or my patrol car?

7   Q.   Your vehicle.

8   A.   We were parked in the turnaround just west of the rest

9   stop on the 90.

10  Q.   So, you're saying that you were in -- you were to the

11  right of the westbound lane of traffic; is that correct?

12  A.   Or technically be -- we were south, I guess.  We were in

13  the turnaround facing north.  If you're going on exact

14  direction, we were facing north and perpendicular to --

15  Q.   To the westbound lane?

16  A.   Correct.

17  Q.   Okay.  So, you let the Honda pass you; is that correct?

18  A.   Correct.

19  Q.   And when you let the Honda pass you, did you pull out

20  behind the Honda?

21  A.   Yes.  I don't recall if it was directly behind.  We would

22  have had to wait for an opening in traffic, but there wasn't

23  a ton of traffic, as I can recall.

24  Q.   Did you pull the Honda to the right or to the left?

25  A.   To the right.

1   Q.  So the Honda was pulled over to the right?

2   A.  Correct.

3   Q.  Okay.  So when you approached the Honda, you were closest

4   to the traffic lane; is that correct?

5   A.  No.  I approached the passenger side of the Honda.

6   Q.  Okay.  So, you approached the passenger side.  So,

7   Officer Szkatulski did not approach the driver?

8   A.  He did.

9   Q.  He did approach the driver?

10  A.  He approached the driver side.  I approached the

11  passenger side.

12  Q.  Okay.  I thought you said it was for safety purposes you

13  don't do that?

14          MS. HIGGINS:  Objection, Judge.

15          THE WITNESS:  For safety purposes, we ask the driver

16  to exit and speak to us so we're not standing close to the

17  lane.

18  BY MS. KUBINIEC:

19  Q.  Okay.  And where did you speak with the driver -- or

20  where did Szkatulski speak with the driver?

21  A.  He spoke with the driver on the shoulder generally.  It

22  is in the area of our patrol car.  The -- if you can picture

23  the front passenger tire, our patrol car -- so, we don't

24  speak to people in between the vehicles, again, for safety

25  reasons.  If the patrol car were to be rear-ended, you don't

1    want to be in between, so we were to the right of the patrol

2    car off, you know, on the stone or grass area, I guess you

3    would call it.

4    Q.  At a certain point, Deputy, you issued a traffic ticket;

5    is that correct?

6    A.  Correct.

7    Q.  And that was Defendant's Exhibit 1 that you reviewed

8    earlier?

9    A.  Yes.

10            MS. HIGGINS:  Objection.

11            THE COURT:  That was Government Exhibit 1.

12            MS. KUBINIEC:  I'm sorry.

13    BY MS. KUBINIEC:

14    Q.  Government Exhibit 1.  I'm automatically speaking as the

15    defendant attorney.  Sorry.

16    A.  It's okay.

17    Q.  It was Government Exhibit 1.  And this was based on your

18    personal knowledge; is that correct?

19    A.  Yes.

20    Q.  And you issued this ticket for no headlamps and inclement

21    weather; is that correct?

22    A.  Correct.

23    Q.  As part of your job as an Erie County sheriff, do you

24    often issue tickets?

25    A.  Yes.

1    Q.  So, you have issued many tickets?

2    A.  I would agree with that.  Yes.

3    Q.  How many tickets would you say you have issued this year?

4    A.  I wouldn't be able to give an exact number without

5    checking.

6    Q.  Fifty?

7    A.  Probably less.  I'm in a different position now, so I

8    don't do as much traffic enforcement as I previously did.

9    Q.  Okay.  Did you issue -- were you involved in traffic

10   enforcement in 2023?

11   A.  Yes.

12   Q.  So, it's fair to say you issued tickets at that time?

13   A.  Most likely, yes.

14   Q.  Also traffic tickets?

15          MS. HIGGINS:  Objection, Judge.  That wasn't his

16   testimony.

17          THE COURT:  I'll overrule it.

18   BY MS. KUBINIEC:

19   Q.  All sorts of traffic tickets for different violations?

20   A.  Sure.

21   Q.  And, as part of your job as an Erie County sheriff, you

22   then appear in court to prosecute those --

23          MS. HIGGINS:  Objection, Judge.

24   BY MS. KUBINIEC:

25   Q.  -- tickets?

1          MS. HIGGINS:  We're going beyond the scope of what

2    this witness is here to testify about, as we stated in the

3    beginning.

4          THE COURT:  She's asking questions about the ticket.

5    The ticket was --

6          MS. HIGGINS:  Sure.  I want to highlight that --

7          THE COURT:  Overruled.  Go ahead.

8    BY MS. KUBINIEC:

9    Q.  As part of your job as an Erie County sheriff, you appear

10   in court to prosecute those tickets, correct?

11   A.  If we are requested, yes.

12   Q.  Okay.  And without you, though, those tickets cannot be

13   prosecuted, correct?

14         MS. HIGGINS:  Objection, Judge.  Now this is beyond

15   the ticket and --

16         THE WITNESS:  I can't say --

17         MS. HIGGINS:  -- beyond the scope of this hearing.

18         THE COURT:  Sustained.

19   BY MS. KUBINIEC:

20   Q.  Did you appear in Clarence Town Court to prosecute this

21   ticket, Officer Reeves?

22         MS. HIGGINS:  Objection, Judge.  Again, beyond the

23   scope.

24         THE COURT:  Overruled.

25         THE WITNESS:  I did not.

 1   BY MS. KUBINIEC:

 2   Q.  Okay.  So you never appeared in court for trial on this

 3   ticket?

 4          MS. HIGGINS:  Objection, Judge.  Same objection.

 5          THE COURT:  Well, you asked him if he ever appeared

 6   on this ticket.  He said no.  And now you're asking if he

 7   appeared for trial on the ticket.  It's the same question.

 8   You got your answer.

 9          MS. KUBINIEC:  Okay.

10   BY MS. KUBINIEC:

11   Q.  Are you aware that the charges in this matter were

12   dismissed?

13          MS. HIGGINS:  Objection, Judge.  Beyond the scope of

14   this hearing.

15          THE COURT:  Sustained.

16   BY MS. KUBINIEC:

17   Q.  Did you ever complete a 710.30 with regard to this

18   ticket?

19          MS. HIGGINS:  Objection, Judge.  Beyond the scope of

20   this hearing.

21          THE COURT:  Did he ever ask -- what kind of --

22   BY MS. KUBINIEC:

23   Q.  Complete a 710.30, an information with regard to anything

24   that the defendant might have said with regard to this

25   ticket?

1          MS. HIGGINS:  Objection, Judge.  Beyond the scope of

2    the hearing.

3          THE COURT:  Overruled.

4    BY MS. KUBINIEC:

5    Q.  Did you complete a 710.30?

6    A.  I don't recall.  If I -- without looking at the file, I

7    wouldn't be able to recall.

8    Q.  Okay.  Did you talk to the assistant district attorney in

9    Clarence about this ticket?

10         MS. HIGGINS:  Objection, Judge.  We're going way

11   beyond the scope again.

12         THE COURT:  Overruled.

13         THE WITNESS:  I don't remember speaking to anybody

14   about it.  No.

15   BY MS. KUBINIEC:

16   Q.  And, again, you were the officer that signed this ticket

17   and issued this ticket; is that correct?

18   A.  Yes.

19   Q.  As well as the supporting police report which is marked

20   as Government Exhibit 2, you signed and you actually typed

21   this up; is that correct?

22   A.  Correct.

23   Q.  Deputy, you testified about the demeanor of the passenger

24   in this stop; is that correct?

25   A.  Yes.

1  Q.  And in your training and in your experience as a police

2  officer, as a deputy sheriff, have you noticed that many

3  individuals are nervous when talking to police officers and

4  deputy sheriffs?

5  A.  I don't know if I could say many.  Some people are.

6  Q.  Some people are nervous when they talk to the police; is

7  that correct?

8  A.  Could be.  Yeah.

9  Q.  And you don't know why that is, correct?

10  A.  It would be -- I would be generalizing.  I mean, each

11  person's different, so --

12  Q.  Correct.  Deputy, do you have any K-9 training?

13          MS. HIGGINS:  Objection, Judge.  This is beyond this

14  witness's testimony.  We did not represent that he was the K-9

15  person here.

16          THE COURT:  Overruled.

17          MS. HIGGINS:  He observed a K-9 stop.

18          THE COURT:  You can ask the question.  I overruled

19  it.

20          MS. KUBINIEC:  Okay.

21  BY MS. KUBINIEC:

22  Q.  You testified that the dog made an indication at the rear

23  of the vehicle?

24          THE COURT:  Just to be clear, you're abandoning that

25  question?  Your question was, did you have any dog training.

 1              MS. KUBINIEC:  Oh, I'm sorry.

 2   BY MS. KUBINIEC:

 3   Q.  Can you answer that?

 4   A.  Yes.

 5   Q.  You do have dog training?

 6   A.  I do.

 7   Q.  Are you certified as a K-9 officer?

 8   A.  I am.  I resigned from the unit six weeks ago but, at the

 9   time, I was a K-9 handler.  Yes.

10   Q.  Did you have your own dog?

11   A.  I had a new dog which was not yet certified.  We were

12   still in training.

13   Q.  You also testified that the route that the defendants

14   were travel -- or that Mr. Hernandez was traveling was a

15   known corridor for narcotics, correct?

16   A.  Correct.

17   Q.  It is also the main route from New York City to Buffalo,

18   correct?

19              MS. HIGGINS:  Objection as to the main route, Judge.

20   That's not --

21              THE COURT:  If he knows.

22              THE WITNESS:  It's one of the routes.  I don't know

23   if I would call it the main.

24   BY MS. KUBINIEC:

25   Q.  Well, it's the biggest road.  How about that?

1              MS. HIGGINS:  Objection, Judge, characterization of

2    the biggest road.

3              THE COURT:  If you know.

4    BY MS. KUBINIEC:

5    Q.  If you know?

6    A.  I'm not really sure what you mean by the biggest road.

7    Q.  It's a highway, correct?

8    A.  Correct.  Interstate.

9    Q.  Interstate highway from New York City to Buffalo,

10   correct?

11   A.  It goes to New York City among other places, yes.

12             MS. KUBINIEC:  That's all I have for this witness,

13   Your Honor.

14             MS. HIGGINS:  I have no redirect, Judge.

15             THE COURT:  Thank you, sir.  You can step down.

16             THE WITNESS:  Thank you, sir.

17   (The witness was excused at 11:20 a.m.)

18   (An off-the-record discussion was held.)

19             THE COURT:  Okay.  Let's go ahead and call the next

20   witness.

21             MS. HIGGINS:  Yes, Judge.  The government is calling

22   Deputy Szkatulski.  I'll go grab him.  It's sergeant, not

23   deputy.

24   (The witness was sworn at 11:23 a.m.)

25             THE WITNESS:  Eric Szkatulski, E-R-I-C,

```
 1    S-Z-K-A-T-U-L-S-K-I.

 2              MS. HIGGINS:  May I Judge?

 3              THE COURT:  Yes.

 4              MS. HIGGINS:  Thank you.

 5

 6                        DIRECT EXAMINATION

 7

 8    BY MS. HIGGINS:

 9    Q.  Good morning, Sergeant.  How are you employed?

10    A.  I'm employed by the Erie County Sheriff's Office, Police

11    Services Division.

12    Q.  How long have you been employed by the Erie County

13    Sheriff's Office?

14    A.  Since 2011.  Fourteen years.

15    Q.  During your career at the Erie County Sheriff's Office,

16    have you received training with respect to narcotic stops?

17    A.  Yes.

18    Q.  And I should also say narcotics cases more broadly?

19    A.  Yes.

20    Q.  Are you currently assigned to a certain unit or group?

21    A.  Yes.  I'm assigned to the K-9 Unit.

22    Q.  And in April of 2023, what unit or group were you

23    assigned to?

24    A.  I was also assigned to the K-9 Unit at that time.

25    Q.  What are your duties and responsibilities as a member of
```

1    the K-9 Unit?

2    A.  Respond to call-outs for various reasons whether it's

3    narcotic detection, whether it's patrol work, tracking.

4    Q.  I want to direct your attention to April 28th, 2023.  Do

5    you recall whether you were working that day?

6    A.  I was.

7    Q.  Did you participate in a traffic stop at the I-90 or on

8    the I-90 westbound?

9    A.  I did.

10   Q.  How did that traffic stop originate?

11   A.  I had been contacted by a member of our narcotics unit,

12   whom exactly I do not recall, but I was asked if I could come

13   out to assist.

14   Q.  And what information did that individual provide you with

15   respect to the assistance he was requesting -- he or she was

16   requesting?

17           MS. KUBINIEC:  Objection, Your Honor.

18           THE COURT:  Overruled.

19           MS. KUBINIEC:  Source of this information?

20           THE COURT:  Overruled.  Go ahead.

21   BY MS. HIGGINS:

22   Q.  You can answer.

23   A.  Could you ask it again?  Sorry.

24   Q.  Absolutely.  What information, if any, did the individual

25   who contacted you to assist in this operation provide to you?

1    A.  A vehicle that I was to look for and see if I was able to

2    make a traffic stop on it.

3    Q.  And what information about the vehicle, if any, did this

4    individual provide to you?

5    A.  I knew there was a black minivan, and I knew it was going

6    to be heading westbound.  I knew it was part of a narcotics

7    investigation.  Other than that, I didn't have much

8    information on it.

9    Q.  And once you received that information, what did you do

10   next?

11   A.  I stationed myself on the I-90 in the center median so I

12   could observe westbound traffic.

13   Q.  Now, you -- after you received the information, did you

14   proceed to that area alone?

15   A.  No.

16   Q.  Were you with a partner that day?

17   A.  I was.

18   Q.  And who was that partner?

19   A.  Sergeant -- he was a deputy at the time -- Joseph Reeves.

20   Q.  And you just testified that you proceeded, once you got

21   this information, to the I-90 westbound, correct?

22   A.  Not immediately.  I believe I went and picked up Deputy

23   Reeves.  He wasn't initially in my car when I was asked to

24   assist.

25   Q.  And you were using your car?

1  A.  Yes.

2  Q.  Do you recall specifically where you were sitting to look

3  for this vehicle on the I-90?

4  A.  When you say specifically, I know I was in the center

5  median.  I know I was east of the Transit/Clarence Exit.  I'm

6  not super familiar with the area, so I can't give you a mile

7  marker or -- be more descriptive than that, I can't at this

8  time.

9  Q.  At a certain point, as you are sitting there, did you or

10 Sergeant Reeves receive information that someone had observed

11 the vehicle in question?

12 A.  Yes.

13 Q.  After you received that communication, did you observe

14 the vehicle -- a vehicle that matched the description you

15 were looking for?

16 A.  I did.

17 Q.  And what, if anything, did you observe about the vehicle

18 when you saw it?

19 A.  It was travelling westbound.  I also noticed that it had

20 wipers on and that vehicle did not have headlights on.  It

21 was raining.

22 Q.  And what is the significance, if any, of that

23 observation?

24 A.  It's a violation of New York State Traffic Law.

25 Q.  And what is the violation actually?  Why does a car need

1  to have its lights on with its wipers?

2  A.  It's part of the law because of viability reasons.

3  Q.  And, on that day, was it raining?

4  A.  Yes.

5  Q.  As you sit here today, do you have an independent

6  recollection that it was raining?

7  A.  I do.

8  Q.  What's that independent recollection?

9  A.  I recall it raining.  I recall myself having wipers on my

10  vehicle so that I could observe the traffic.

11  Q.  And because it was raining, did that inform the fact that

12  you were observing a traffic violation?

13  A.  Yes.

14  Q.  After you observed the black Honda minivan, what did you

15  do?

16  A.  Pulled out into traffic, travelled westbound behind the

17  vehicle and conducted a traffic stop on the vehicle.

18  Q.  And when you pulled out, did you put your lights on your

19  patrol vehicle?

20  A.  Yes.

21  Q.  Was your patrol vehicle marked that day?

22  A.  Yes.

23  Q.  Did the vehicle pull over?

24  A.  It did.

25  Q.  What happened after the vehicle pulled over?

1  A.  After the vehicle pulled over, I approached the vehicle

2  to speak with the operator.

3  Q.  And if you were approaching to speak with the operator,

4  what side of the vehicle did you approach on?

5  A.  It would be the driver side, the side closest to the 90.

6  Q.  On that day, at the time of the stop, what was the

7  traffic flow like?

8  A.  I would say it was heavy.

9  Q.  When you approached the vehicle, how many occupants did

10  you observe?

11  A.  There was two.

12  Q.  Where were the occupants seated?

13  A.  In the front seats, front driver seat, and then front

14  passenger seat.

15  Q.  When you approached the driver side vehicle, what did you

16  do next?

17  A.  I asked the operator to step to the rear of the vehicle

18  so I could have a conversation with him.

19  Q.  Why did you do that?

20  A.  Trying to have a conversation roadside, specifically if

21  there's -- I don't know why, but when there's water on the

22  highway, tires are travelling, it's louder, tougher to hear,

23  and common practice for me, safety reasons, especially with

24  the roadway being wet.  If a car were to apply its brakes and

25  slide, I'd try to get away from the highway if possible.

1    Q.  I'm showing you what's been previously admitted as

2    Government Exhibit 2.  If you could take a look at it and let

3    me know when you are finished?

4    A.  Okay.

5    Q.  Do you recognize this document?

6    A.  Yes.

7    Q.  And what is it, generally?

8    A.  It is a police report that is created in software that we

9    have for our agency, CHARMS.

10   Q.  And what is this police report about?

11   A.  If reflects the incidents of that day.  It's titled

12   traffic arrest.

13   Q.  And if you go to the narrative box, do you see that at

14   the bottom?

15   A.  I do.

16   Q.  Can you read the first sentence of the second paragraph?

17   A.  Deputy Szkatulski -- repeat that again.  The first

18   sentence?

19   Q.  Can you read the first sentence of the second paragraph?

20   A.  Yes.  Sorry.  Due to weather conditions and speed of

21   traffic, Hernandez was asked to exit the vehicle to speak

22   with Deputy Szkatulski roadside.

23   Q.  Is that consistent with your recollection of that day?

24   A.  Yes.

25   Q.  And when it said due to the weather conditions, what did

1  that refer to?

2  A.   The rain.

3  Q.   When you asked the driver to step out of the vehicle, did

4  he comply with your directive?

5  A.   He did.

6  Q.   What, if anything, was Sergeant Reeves doing while you

7  were speaking to the driver of the vehicle?

8  A.   He was up at the vehicle on the passenger side at the

9  front window speaking with the front seat passenger.

10 Q.   Based on your training and experience, are you supposed

11 to separate occupants in a vehicle to speak with them?

12 A.   Yes.

13 Q.   And were you following that training and experience in

14 this traffic stop?

15 A.   Yes.

16 Q.   Also based your training and experience, do you assess

17 the demeanor of occupants of a car when you make a stop?

18 A.   Yes.

19 Q.   Did you do so in this case with respect to the driver of

20 the vehicle?

21 A.   Yes.

22 Q.   What was the demeanor of the driver of the vehicle?

23 A.   Appeared nervous to me, had rapid breathing.

24 Q.   What, if anything, based on your training and experience,

25 did that indicate to you?

1   A.   Nervous.  Nervousness.

2   Q.   Did you ask the driver of the vehicle any questions?

3   A.   Yes.

4   Q.   Generally, what types of questions did you ask him?

5   A.   Where they were heading to, where they were coming from,

6   when they left, any stops along the way.

7   Q.   How long did that conversation last?

8   A.   Minutes.

9   Q.   Are the questions the types of questions that you ask the

10  driver of the vehicle standard questions that you ask during

11  a traffic stop?

12  A.   Yes.

13  Q.   When you finished speaking to the driver, what happened

14  next?

15  A.   After speaking with the driver, I had a conversation with

16  my partner, Sergeant Reeves.

17  Q.   And what did you discuss?

18  A.   Compared stories and timelines from what he had gathered

19  from the passenger of the vehicle.

20  Q.   What, if anything, did you conclude from your

21  conversation with Sergeant Reeves?

22  A.   There were discrepancies on the answers we had received

23  when we asked questions.

24  Q.   So what happened next?

25  A.   At that point, I had deployed K-9 Bo to run a sniff of

1   the exterior of the vehicle.

2   Q.  In making that decision, what weight, if any, did you

3   place on the fact that the vehicle -- strike that.  What

4   weight, if any, did you place on the fact that you received

5   information that this vehicle may have been transporting

6   drugs?

7   A.  None.

8   Q.  So, based on your conversation -- did you employ Bo based

9   on your conversation with Sergeant Reeves?

10  A.  Yes.

11  Q.  And that conversation, as you testified before, included

12  discrepancies in travel.  What, if anything, did Sergeant

13  Reeves tell you about the demeanor of the passenger?

14  A.  He felt the passenger was nervous.

15  Q.  So, based on those facts, did you employ Bo?

16  A.  I did.

17  Q.  I want to step back briefly to discuss your role as a K-9

18  handler.  As of April 2023, how long had you been Bo's

19  handler?

20  A.  For approximately four years at that point.

21  Q.  To become a K-9 handler, do you have to undergo trainings

22  and certifications?

23  A.  I do.

24  Q.  Did you do so?

25  A.  I did.

1  Q.  And can you just briefly describe those for the Court?

2  A.  I was -- initially attended K-9 handler course in 2015

3  with my first K-9.  After he was retired, I was assigned Bo.

4  At that point, I attended a 160-hour course specific to

5  narcotic detection with K-9 Bo.

6  Q.  Now, to qualify as a K-9 dog, did Bo have to undergo

7  training and certifications?

8  A.  Yes.

9  Q.  Can you describe those for the Court?

10 A.  He was paired with me.  It was a team effort for the 160-

11 hour course.

12 Q.  Does Bo have to undergo continuing training?

13 A.  He does.

14 Q.  How often?

15 A.  We train every other week; generally two, sometimes three

16 times a month at the minimum for eight hours a month

17 dedicated specifically for scent detection.

18 Q.  And as of April 28, 2023, can you estimate how many stops

19 you had deployed Bo on?

20 A.  Maybe 50.

21 Q.  Now, turning back to this April 28th, 2023 stop, can you

22 walk the Court through Bo's exterior sniff of the vehicle?

23 A.  Yes.  As we almost always do, we started the sniff at the

24 front and center of the vehicle.  I ran a cursory search,

25 which is just one quick loop around the vehicle where the

1    K-9's nose is directed at nose level.  And then, on the

2    second pass of the vehicle is what we call a detail search

3    where we point out specific areas of the vehicle, generally

4    alternating high and low.

5        When we were at the rear of the vehicle, I noticed Bo

6    showed some alert behavior.  He had a head whip and he

7    starting bracketing odor.  He continued to work the odor.  I

8    kept my feet moving, gave him the leash, let him do his thing.

9    Ultimately, he indicated, came to a final indication, at the

10   rear passenger side fender/window area.

11   Q.  And so, you just testified that Bo exhibited alert

12   behavior but then ultimately indicated in a certain area of

13   the vehicle; is that correct?

14   A.  That is correct.

15   Q.  Once Bo indicated in this area of the vehicle, what did

16   you do?

17   A.  I gave him a verbal praise off, told him good boy, good

18   boy, good boy, took him back to the vehicle, and I put him

19   up.

20   Q.  Based on your training and experience, when Bo alerts or

21   indicates -- I should use the word indicates excuse me -- are

22   you permitted to conduct the search of the vehicle?

23   A.  Yes.

24   Q.  Did you do so here?

25   A.  I did not.

1  Q.  I'm showing you what's been previously marked as

2  Government Exhibit 4.  Take a look and let me know when you

3  are done.

4  A.  Okay.

5  Q.  Do you recognize this document?

6  A.  Yes.

7  Q.  What is it?

8  A.  It's a K-9 affidavit that I prepared.

9  Q.  Is it a fair and accurate copy of the affidavit

10  reflecting the April 28th, 2023 stop?

11  A.  Yes.

12       MS. HIGGINS:  Judge, at this point, the government

13  moves to admit Government Exhibit 4.

14       MS. KUBINIEC:  No objection.

15       THE COURT:  Government 4 shall be admitted into

16  evidence.

17  (Government Exhibit 4 was received in evidence.)

18

19       MS. HIGGINS:  Thank you.

20  BY MS. HIGGINS:

21  Q.  First, Sergeant, do you draft affidavits in every case

22  where you deploy Bo?

23  A.  No.

24  Q.  What is the purpose of drafting an affidavit?

25  A.  I draft it for evidence for court purposes that can be

1   submitted to court, and it's a document that explains the

2   occurrence -- occurrences that -- of the search that we

3   conducted.

4   Q.  When you draft an affidavit with respect to Bo, is it

5   your practice to do so the same day?

6   A.  Yes.

7   Q.  Now, if we go to the last substantive paragraph in this

8   affidavit that starts "On April 28th, 2023", can you read

9   that paragraph into the record, please?

10  A.  Yes.

11      On April 28th, 2023, approximately 15:35 hours, K-9 Bo

12  conducted a sniff on the exterior of New York registration

13  KST7167, a black Honda Odyssey, which had been stopped on the

14  I-90 westbound just east of the Clarence/Transit exit.  During

15  the sniff, K-9 Bo was showing alert behavior on/under the rear

16  bumper.  Bo continued to sniff and indicated the presence of

17  narcotic odor on the rear passenger side window.

18  Q.  Is that an accurate reflection of what happened during

19  Bo's sniff of the vehicle?

20  A.  It is.

21  Q.  Now, do you see the sentence below that paragraph?

22  A.  I do.

23  Q.  And it says affirmed under penalty of perjury this 24th

24  day of April 2023?

25  A.  Correct.

1   Q.  Is that correct?  Now, you just read a paragraph in this

2   affidavit regarding a stop that occurred on April 28th, 2023?

3   A.  Correct.

4   Q.  Can you explain the discrepancy between April 28th, 2023

5   and the date that you say you affirmed this?

6   A.  Yes.  That paragraph that I read is correct.  It did

7   occur on April 28th.  The 24th, that you pointed out, is a

8   clerical error.  This was created on the 28th.

9   Q.  What happened after Bo alerted or indicated in this case?

10  A.  After he indicated, a verbal praise off, and I returned

11  him to the vehicle.  Members from the Narcotics Unit came to

12  the stop and took over.

13  Q.  At some point, were the occupants of the vehicle

14  detained?

15  A.  Yes.

16  Q.  Do you have a recollection of who detained them?

17  A.  I don't recall who put handcuffs on, if you mean detained

18  in that part.  I don't recall.

19          MS. HIGGINS:  Judge, I have no further questions for

20  this witness.

21          THE COURT:  We're going to take a break.  Raida,

22  they're asking for you upstairs.

23  (A recess was taken from 12:30 to 1:06 p.m.)

24          THE CLERK:  We are back on the record in USA vs.

25  Robert Hernandez, case number 23-CR-109, to continue the

 1    evidentiary hearing.

 2            THE COURT:  Thank you.  You're going to cross-

 3    examine now, right?

 4            MS. KUBINIEC:  Are you done?

 5            MS. HIGGINS:  Yes, I'm done.  Thank you.

 6            MS. KUBINIEC:  Okay.

 7

 8                      CROSS-EXAMINATION

 9

10    BY MS. KUBINIEC:

11    Q.  Deputy Szkatulski, taking your attention back to Exhibit

12    4, Government's Exhibit 4, which is your affidavit or your

13    affirmation?  It's actually called both, but do you recall

14    executing that affidavit?

15    A.  Yes.

16    Q.  And you drafted that yourself?

17    A.  I did.

18    Q.  And you stated that you drafted it on the date that it

19    occurred; is that correct?

20    A.  The 28th, yes.

21    Q.  The 28th of April of 2023?

22    A.  Yes.

23    Q.  And as part of that affidavit -- let's back up.  You said

24    you don't draft affidavits in every case; is that correct?

25    A.  That's correct.

1   Q.  That you draft it if you think it's going to be needed

2   for court?

3   A.  Correct.

4   Q.  And so, did you know that the day and time, the 28th of

5   April of 2023, that this was going to be needed for court?

6   A.  I was under the impression it was going to be needed,

7   yes.

8   Q.  Okay.  What gave you that impression?

9   A.  That the dog's indication was going to be utilized

10  possibly to draft a search warrant.

11  Q.  And so, you executed -- you drafted and executed that

12  affidavit right away?

13          MS. HIGGINS:  Objection.  What is right away?

14          MS. KUBINIEC:  On the same day --

15          THE COURT:  Either he'll understand or he won't

16  understand, and he'll answer the question.

17          THE WITNESS:  When you say right away, I don't know

18  what timeline -- but it was on that date following the

19  indication.

20  BY MS. KUBINIEC:

21  Q.  And did you do that back at 45 Elm Street?

22  A.  Yes.

23  Q.  That's your home as a -- your employment home?

24  A.  We have offices there, but no.  I'm not stationed out of

25  45 Elm.

1  Q.  But that's where you drafted it?

2  A.  Correct.

3  Q.  And did you review it before you signed it?

4  A.  Yes.

5  Q.  And you affirmed that it was true, which is an

6  affirmation; is that correct?

7  A.  Correct.

8  Q.  That's like swearing it's true, correct?

9  A.  Correct.

10  Q.  And you understand the importance of your affidavit being

11  correct?

12  A.  Yes.

13  Q.  And you didn't -- the date -- but the date on that

14  affidavit is incorrect?

15  A.  That statement is correct.

16  Q.  Okay.  And -- but the date that you dated it, April 24th

17  of 2023, is incorrect?

18  A.  Good statement.  Yes.

19  Q.  Okay.  So, you understand the importance of having

20  correct information in the document --

21          MS. HIGGINS:  Objection, Your Honor.

22  BY MS. KUBINIEC:

23  Q.  -- correct?

24          MS. HIGGINS:  Asked and answered.

25          THE COURT:  Overruled.

1          THE WITNESS:  Yes.

2   BY MS. KUBINIEC:

3   Q.   You know that this is going to be used in court or by

4   attorneys?

5   A.   Potentially, yes.

6   Q.   You testified earlier, Deputy, that your dog Bo is a K-9

7   officer; is that correct?

8   A.   Yes.

9   Q.   When was the -- prior to April 28th of 2023, when was the

10  last training that Bo had?

11  A.   I don't recall what the date was of his prior training.

12  It would have been that month.

13  Q.   April of 2023?

14  A.   Yes.

15  Q.   And is it your testimony that he's trained every month?

16  A.   Correct.

17  Q.   And what is he trained to detect?

18  A.   Heroin, cocaine, methamphetamines as far as narcotic

19  odors.

20  Q.   So, does he have training to detect other things as well?

21  A.   He's trained for patrol work, which is another aspect of

22  his dual-purpose duties.

23  Q.   And he is -- the dog is specific to you; is that correct?

24  A.   That's correct.

25  Q.   He doesn't work with any other deputies?

```
 1   A.  He does not.

 2   Q.  And that's true about his whole trajectory in the

 3   sheriff's office, correct; he only works with you?

 4   A.  When you say works with me, he works with a team.  But as

 5   far as deployment-wise, mostly with me.

 6   Q.  Does he also live with you?

 7   A.  He does.

 8   Q.  So, he's with you most of the time?

 9   A.  Yes.

10        MS. HIGGINS:  Objection, Judge.  This seems beyond

11   the scope of why the officer is here to testify.

12        THE COURT:  Overruled.

13   BY MS. KUBINIEC:

14   Q.  There are other factors that can affect Bo's ability to

15   detect, to do his job, correct?

16   A.  Yes.

17   Q.  Okay.  And he can be influenced by the environment around

18   him, correct?

19        MS. HIGGINS:  Objection, Judge.  This is beyond the

20   scope of what was raised in the motion and beyond the scope of

21   this hearing.

22        THE COURT:  That's all right.  Overruled.

23        THE WITNESS:  Yes.

24   BY MS. KUBINIEC:

25   Q.  And he could be distracted by things while on the job,
```

1    correct?

2    A.   Yes.

3    Q.   And he also wants to please you, correct?

4          MS. HIGGINS:  Objection, Judge.  Same objection as

5    before.

6          THE COURT:  I don't know if we can look into the

7    psyche of a dog.

8          MS. KUBINIEC:  I'm asking the officer if --

9          THE COURT:  I'll sustain that.  Go on to your next

10   question.

11         MS. KUBINIEC:  Okay.

12   BY MS. KUBINIEC:

13   Q.   Deputy, going to the day of April 28th of 2023, you

14   stated that the -- that you did an initial pass around the

15   car; is that correct?

16   A.   Correct.

17   Q.   And during that time when you did that, what's the

18   purpose of that initial pass?

19   A.   The initial pass is a cursory search that I always run

20   with the dog, go as fast as I can, let him sniff the entire

21   exterior.  Sometimes -- and I always follow up with a detail.

22   Q.   Okay.  So, then you did a second pass; is that correct?

23   A.   Correct.

24   Q.   And when you say he alerted, what does that mean?

25   A.   He showed alert behavior.  It's an untrained response

1   from the K-9 when there's a target odor present.

2   Q.  What did -- is the alert behavior he showed?

3   A.  For him, a head buck.  You'll notice a breathing change.

4   Won't be breathing from the mouth.  The nose will get rapid.

5   Tail will get more erect, curve more, wag more.

6   Q.  And this is your interpretation, correct?

7   A.  My observations, yes.

8   Q.  Deputy, you referred to having a discussion with the

9   driver of the car; is that correct?

10  A.  Yes.

11  Q.  And when you had that discussion with the driver of the

12  car, do you recall him pointing out the lights in the front

13  of his car that were on?

14          MS. HIGGINS:  Objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  I don't recall.

17  BY MS. KUBINIEC:

18  Q.  Did you walk to the front of the car with the driver?

19  A.  I don't recall that.

20  Q.  Do you recall the driver telling you that he had

21  automatic lights on the vehicle that came on?

22          MS. HIGGINS:  Objection, Judge.

23          THE COURT:  Overruled.

24          THE WITNESS:  I don't recall that.

25

1    BY MS. KUBINIEC:

2    Q.   Deputy, did you have video recording equipment on you at

3    that stop?

4    A.   I don't recall if I had equipment on me, but I did not

5    have anything recording.

6    Q.   Were you wearing an automatic video recorder on your

7    person?

8    A.   I don't recall if I was wearing one.

9    Q.   But if you were wearing one, it would have been

10   recording; is that correct?

11           MS. HIGGINS:   Objection, Judge.   That wasn't his

12   testimony.

13           THE COURT:   I think he said there was no recording

14   going on.

15           MS. KUBINIEC:   No, he said he doesn't --

16           THE COURT:   He couldn't remember if he had it on.   If

17   it was, it wasn't recording.   That's what he said.

18   BY MS. KUBINIEC:

19   Q.   Was there a dash cam in your car?

20   A.   No.

21   Q.   Do you recall if your partner, Deputy Reeves, was wearing

22   recording equipment?

23   A.   I don't recall him wearing recording equipment.

24   Q.   Deputy, did you ever appear in Clarence Town Court with

25   regard to the summons issued in this case?

```
1              MS. HIGGINS:  Objection, Judge.  Beyond the scope.

2              THE COURT:  Overruled.

3              THE WITNESS:  No.

4   BY MS. KUBINIEC:

5   Q.  Did you ever speak to an assistant district attorney in

6   Erie County with regard to this traffic ticket?

7              MS. HIGGINS:  Objection, Judge.  He has not

8   established that he had anything to do with the traffic ticket

9   or seen the traffic ticket or anything.

10             THE COURT:  Overruled.

11             THE WITNESS:  No.

12             MS. KUBINIEC:  That's all I have, Your Honor.

13             MS. HIGGINS:  Very brief redirect, Judge.

14             THE COURT:  Sure.

15

16                       REDIRECT EXAMINATION

17

18  BY MS. HIGGINS:

19  Q.  Sergeant, you were asked on cross-examination about

20  observations you made with respect to Bo; is that correct?

21  A.  Yes.

22  Q.  And you were asked specifically about observations when

23  he indicates and also observations with respect to alert

24  behavior; is that correct?

25  A.  Yes.
```

1  Q.  When you receive training with respect to being a K-9

2  handler, are you trained to observe certain observations?

3  A.  Yes.

4  Q.  Similarly, is Bo trained to alert or to indicate in a

5  certain way based on what he smells?

6  A.  He is trained to indicate.  Correct.

7  Q.  And so, when you make those observations when a dog --

8  when Bo is indicating or exhibits alert behavior, is that

9  based on your training and experience?

10 A.  Yes.

11         MS. HIGGINS:  Nothing further.

12         THE COURT:  Ms. Kubiniec?

13         MS. KUBINIEC:  I have nothing further, Your Honor.

14         THE COURT:  You can step down, sir.

15         THE WITNESS:  Thank, sir.

16 (The witness was excused at 12:47 p.m.)

17         MS. HIGGINS:  Judge, the government calls Deputy

18 William Granville.

19 (The witness was sworn at 12:48 p.m.)

20         THE CLERK:  Please have a seat.  When seated, state

21 your name, and spell it for the record, and please speak into

22 the microphone as this is being recorded.  Thank you.

23         THE WITNESS:  William Granville, G-R-A-N-V-I-L-L-E.

24         MS. HIGGINS:  May I, Judge?

25         THE COURT:  Yes.

1              MS. HIGGINS:  Thank you.

2

3                      DIRECT EXAMINATION

4

5   BY MS. HIGGINS:

6   Q.  Good afternoon.  How are you employed?

7   A.  Erie County Sheriff's Office, Narcotics Unit.

8   Q.  What's your current title?

9   A.  Deputy.

10  Q.  Deputy, how long have you been with the Erie County

11  Sheriff's Office?

12  A.  A little over 14 years.

13  Q.  During your career at the Erie County Sheriff's Office,

14  have you received training?

15  A.  Yes.

16  Q.  Specifically, have you received training with respect to

17  narcotics investigations?

18  A.  Yes, I have.

19  Q.  And can you briefly describe that training?

20  A.  The academy teaches about recognition, packaging, and

21  there have been multiple trainings with individual groups.

22  Q.  Are you currently assigned to a certain unit or group?

23  A.  Yes, the FBI Safe Streets Task Force.

24  Q.  In April 2023, were you also assigned to that same group?

25  A.  Yes.

1  Q.  And how long have you been part of the Safe Streets Task

2  Force?

3  A.  Approximately three years.

4  Q.  What are your responsibilities and duties in this

5  capacity?

6  A.  Surveillance, search warrants, arrest warrants.

7  Q.  I want to direct your attention to April 28th, 2023.

8  Were you working that day?

9  A.  Yes.

10  Q.  Were you involved in coordinating assistance with respect

11  to the Safe Streets Task Force to look out for a certain

12  vehicle?

13  A.  Yes.

14  Q.  How did you become involved?

15  A.  Special agents from the Safe Streets Task Force requested

16  my and patrol's assistance.

17  Q.  And how did he make that request?

18  A.  Via telephone.

19  Q.  What, if anything, did the agent share with you about the

20  request?

21  A.  That an individual was transporting suspected narcotics

22  in a minivan to -- from New York to Buffalo.

23  Q.  And what, if anything, did he share with you about the

24  source of the information?

25  A.  That he had a confidential source who has met with an

1    individual multiple times and was setting up deals for

2    illegal narcotics.

3         MS. KUBINIEC:  Objection, Your Honor.  What is the

4    source of this information?

5         THE COURT:  Overruled.

6    BY MS. HIGGINS:

7    Q.  What, if anything, did he share with you about how he

8    knew the location of the vehicle?

9    A.  The vehicle was loaded -- located in New York via -- the

10   confidential human source identified a photo and he went

11   through investigative procedures to locate this vehicle.

12   Q.  And what specific investigative procedures did he go

13   through if he shared that with you?

14   A.  Running through New York State registered vehicles that

15   were registered to either the -- Mr. Hernandez or family

16   members.

17   Q.  Were you aware, when he requested your assistance, that

18   he had sought -- that the agent had sought a ping warrant?

19   A.  Yes.

20   Q.  After you received this request from the agent, what, if

21   anything, did you do next?

22   Q.  Contacted patrol, two patrol units, to meet us in the

23   vicinity of the New York State Thruway.

24   Q.  And what did you tell the patrol units?

25   A.  I explained that there was a black Honda Odyssey.  I gave

1    them the license plate and an individual was going to be

2    transporting narcotics with that.

3    Q.   Now, besides the initial request from the FBI agent, were

4    you in communication with this agent throughout the day on

5    April 28th?

6    A.   Constantly, yes.

7    Q.   Were you also in communication with the patrol that was

8    sitting at the stop on April 28th, 2023?

9    A.   Constantly, yes.

10    Q.   And how was that communication facilitated?

11    A.   Via radio and telephone.

12    Q.   In this communication, were you receiving realtime

13    updates with respect to the vehicle?

14    A.   Yes.

15    Q.   And were you receiving realtime updates both from the

16    federal people involved?

17    A.   Yes.

18    Q.   And were you receiving realtime updates from the patrol

19    individuals involved?

20    A.   Yes.  I had two radios and a cell phone in my vehicle.

21    Q.   At some point, did you receive information that the

22    patrol unit had initiated a traffic stop?

23    A.   Yes.

24    Q.   What, if anything, did you learn about that traffic stop?

25    A.   I -- at the time, the only thing I knew was they

1    initiated a traffic stop.  We pulled over short of the

2    traffic stop, not to be seen by counter-surveillance, and

3    they had both individuals out talking to them.

4    Q.  What, if anything, did you learn subsequent to your

5    observation of the patrol officers having the two individuals

6    out of the car?

7    A.  That there was inconsistent stories and positive K-9

8    indication on the rear of the vehicle.

9    Q.  What happened after you learned about the positive

10   indication by the K-9?

11   A.  We pulled up on the traffic stop.

12   Q.  And, at this point, were the defendants detained?

13   A.  They were.

14   Q.  Do you recall who detained them?

15   A.  The Erie County Sheriff's Office.

16   Q.  At any point on April 28th, 2023, did you, yourself,

17   observe the vehicle that matched the description the FBI

18   agent shared with you?

19   A.  Yes.

20   Q.  And when did you observe it?

21   A.  When it passed by me just short of the -- I'm going back

22   here, I apologize -- rest stop.

23   Q.  On April 28th, 2023, do you recall signing an affidavit

24   in support of a search warrant for a black Honda Odyssey?

25   A.  Yes.

1  Q.  Now, Deputy, let me stop you there.  You just testified

2  that you learned that there was a positive indication by a

3  K-9 on the vehicle; is that correct?

4  A.  Yes.

5  Q.  Based on your training and experience, when a K-9

6  indicates on a vehicle, can those officers execute a search?

7  A.  Yes.

8  Q.  Did they do so here?

9  A.  I'm not sure.

10  Q.  Did you prepare the search warrant affidavit and

11  application for a search warrant for that vehicle?

12  A.  Yes.

13  Q.  I'm showing you what has been previously marked as

14  Government Exhibit 5.  Could you please take a look and tell

15  me what it is?

16  A.  Done now.

17  Q.  Do you recognize this document?

18  A.  Yes.

19  Q.  What is it?

20  A.  It's the search warrant application, search warrant that

21  I had drafted.

22  Q.  And is your signature on that?

23  A.  Yes.

24  Q.  Is that a fair and accurate depiction of the affidavit,

25  application, and search warrant for the black Honda Odyssey

1    that you prepared on April 28th, 2023?

2    A.  Yes.

3              MS. HIGGINS:  Judge, at this point, the government

4    moves to admit Government Exhibit 5 into evidence.

5              MS. KUBINIEC:  Well, there's other things attached to

6    your -- to the search warrant application.  Are you trying to

7    admit those as well?

8              MS. HIGGINS:  Yes.

9              MS. KUBINIEC:  Well --

10             MS. HIGGINS:  This is the application.

11             MS. KUBINIEC:  They haven't been identified.

12             MS. HIGGINS:  Yes, they have.  I just identified

13   them.  It's the application, his affidavit, and the search

14   warrant itself.

15             MS. KUBINIEC:  Oh, okay.  You didn't identify it

16   before.

17             MS. HIGGINS:  I just identified it when I asked to

18   move it in.

19             MS. KUBINIEC:  All right.  No objection as long as

20   they're all identified.

21             THE COURT:  All right.  Government Exhibit 5 should

22   be admitted into evidence.

23   (Government Exhibit 5 was received in evidence.)

24

25             MS. HIGGINS:  Thank you.

1   BY MS.  HIGGINS:

2   Q.  Agent, if you look -- sorry.  Deputy, if you look at

3   paragraph 2 of your affidavit on this first page, 2A, what

4   does that information pertain to?

5   A.   Information received from a special agent.

6   Q.  And what is it about, in summary?

7   A.   In summary, it's about the Honda Odyssey and transporting

8   narcotics to Erie County; specifically, Buffalo, New York.

9   Q.  And do you see that first sentence in 2A it says, your

10  affiant had received information from a reliable confidential

11  source?

12  A.  Yes.

13  Q.  Is that an accurate statement?

14  A.  Speaking of affiant, it's more of, like, the team, I

15  would say.

16  Q.  So, when you're saying your affiant, what did you mean by

17  that?

18  A.  That me, Special Agent Middlebrooks were in receipt of

19  this information from a confidential human source.

20  Q.  Did you, yourself, ever have a conversation with the

21  confidential source?

22  A.  No.

23  Q.  Did you ever have a meeting with the confidential source?

24  A.  No.

25  Q.  The information in paragraph 2A, where did that

1    information come from?

2    A.   A special agent with Safe Streets.

3    Q.   Now, I want you to go down to the sentence that begins,

4    the confidential source, sources, has observed Hernandez.  Do

5    you see that sentence?

6    A.   Yes.

7    Q.   And you've read it to yourself?

8    A.   Yes.

9    Q.   Is that an accurate statement?

10   A.   No.

11   Q.   When did you learn that that was not an accurate

12   statement?

13   A.   Two days ago.

14   Q.   And who communicated that to you?

15   A.   You did.

16   Q.   When you prepared this affidavit, did you believe that

17   that statement was accurate?

18   A.   Yes.

19   Q.   And were you basing this information on your

20   understanding of what Agent Middlebrooks told you?

21   A.   Yes.

22   Q.   When did you draft this affidavit relative to the stop?

23   A.   It took us about 45 minutes or so to get back to the

24   office, put two individuals in separate rooms, and I started

25   it right then.

GRANVILLE -- BY MS. HIGGINS -- 06/18/2025

1   Q.   So, based on your testimony, you drafted this after the

2   stop; is that correct?

3   A.   Yes.

4   Q.   Did you include information in this affidavit that you

5   learned about the stop?

6   A.   Yes.

7   Q.   And what was that information?

8   A.   The K-9 affidavit.

9   Q.   And who did you receive that information from?

10  A.   Deputy Szkatulski.

11  Q.   And can you read, beginning at the bottom of page 1, "On

12  April 28th, 2023"?  Can you read that paragraph and it

13  continues into the second page as well.

14  A.   April 28, 2023 approximately 15:19 hours, ECSO marked

15  patrol units observed a 2019 Honda Odyssey bearing New York

16  registration KST7167 traveling in a westerly direction on the

17  New York State Thruway, Interstate 90.  ECSO marked units

18  observed the operator of the vehicle commit a New York State

19  vehicle and traffic violation and a traffic stop was

20  conducted.  The vehicle operator was identified via New York

21  State driver's license as Robert Hernandez, date of birth

22  4/4/1978.

23  Q.   Do you see on page 2, paragraph C, subsection 3, that

24  says "It's requested"?  Do you see that?

25  A.   Yes.

1   Q.  What is that paragraph about?

2   A.  Keeping the confidential source's identity secret.

3   Q.  And what, if any, conversation did you have with Agent

4   Middlebrooks about keeping the source in this case secret?

5   A.  Not only this one, in every case, it's pretty standard to

6   do that.

7   Q.  And why?

8   A.  Because the risk of that person being hurt or

9   retaliation.

10  Q.  And why did you apply for a search warrant in this case

11  if you had a K-9 alert on the vehicle?

12  A.  The K-9 alert isn't enough.  You have to go to a judge

13  and get the search warrant signed to be able to actually

14  search the vehicle.

15  Q.  So, it's your understanding that the K-9 alert -- when a

16  K-9 alerts on a vehicle, that's not enough to search?

17  A.  Yes.

18  Q.  Did you want to ensure that the probable cause was laid

19  out clearly in this affidavit?

20  A.  Absolutely.

21       MS. HIGGINS:  Okay.  I have no further questions for

22  this Deputy.

23       THE COURT:  There's water there if you need some.

24       THE WITNESS:  Thanks, Judge.

25

1                    CROSS-EXAMINATION

2

3    BY MS. KUBINIEC:

4    Q.  Deputy, you've testified that you have been an -- with

5    the Erie County Narcotics Department for 14 years?

6    A.  Yes, ma'am.

7    Q.  And how many search warrants have you applied for in that

8    time?

9    A.  More than -- right around 50 if not more.

10   Q.  Okay.  And when you apply for those search warrants, you

11   swear to the truth of them, to the truth of the contents of

12   your application, correct?

13   A.  Yes.

14   Q.  And why do you do that?

15   A.  To make sure that everything in the search warrant is

16   accurate.

17   Q.  Okay.  And by accurate meaning that you understand that

18   it's accurate, right?

19   A.  Yes, ma'am.

20   Q.  You're swearing to the truth of the things in the

21   affidavit?

22   A.  Yes.

23   Q.  This affidavit was given by you, correct?

24          MS. HIGGINS:  Objection, Judge.  That's already been

25   established.

1          THE COURT:  Overruled.

2          THE WITNESS:  Yes.

3   BY MS. KUBINIEC:

4   Q.  You wrote this affidavit and you signed this affidavit?

5   A.  Yes.

6   Q.  And when you say that you received this information from

7   a confidential source, as you did in paragraph 2, that

8   actually was not true?

9   A.  When I put your affiant, I meant me and also Special

10  Agent Middlebrooks because --

11  Q.  But you didn't specify Special Agent Middlebrooks in this

12  affidavit?

13  A.  Well, we sat down and went over this information, so

14  that's the way I took it.  Yes.

15  Q.  But you didn't specify his name in here.

16  A.  No, I did not.

17  Q.  So the affiant is one person.  That's you?

18  A.  I took it as both of us.

19  Q.  Okay.  But, in fact, you are the person that wrote and

20  signed the affidavit?

21  A.  Yes.

22  Q.  Not him?

23  A.  Correct.

24  Q.  And he's wrote and signed his own affidavit in another --

25  in the application for the ping warrant, correct?

1    A.   On the federal side, yes.

2    Q.   Okay.  So that when you said that you received this

3    information from a confidential source, you never received

4    any information from a confidential source?

5    A.   What I meant was, I received it through Middlebrooks who

6    received it from the confidential source.  So, I put in there

7    that I received the information from a reliable source.

8    Q.   But you never spoke to that confidential source?

9    A.   No.

10   Q.   And did you ever meet that confidential source?

11   A.   Yes.

12   Q.   You met that person?

13   A.   Yes.

14   Q.   But you didn't discuss this issue in paragraph 2 about

15   the Honda Odyssey?

16   A.   No.

17   Q.   And did you discuss with the confidential source that the

18   confidential source observed Hernandez transporting and

19   distributing narcotics while inside the 2019 Honda Odyssey?

20        MS. HIGGINS:  Objection, Judge.  He stated that he

21   never discussed or never talked to the confidential source, so

22   he couldn't have done that.

23        THE COURT:  What was your question?

24        MS. KUBINIEC:  My question is, did he ask the

25   confidential source, as he states in paragraph 2A of the

1    affidavit, did he ask that -- did the confidential source tell

2    him that he observed Hernandez transporting and distributing

3    narcotics while inside the 2019 Honda Odyssey on numerous

4    occasions.

5            MS. HIGGINS:  And I would object, Judge.  He just

6    testified again that he did not talk to the confidential

7    source.

8            THE COURT:  The sentence doesn't say I talked to the

9    confidential source and the confidential source has

10   observed -- it just states a fact there.  I guess I'm not --

11           MS. KUBINIEC:  Okay.

12   BY MS. KUBINIEC:

13   Q.  So, you didn't know that fact concerning what the

14   confidential source observed of your own knowledge, correct?

15           MS. HIGGINS:  Objection, Judge.  He had knowledge of

16   it.  I don't know what your own knowledge means.

17           THE COURT:  Overruled.  Let him answer the question.

18   BY MS. KUBINIEC:

19   Q.  You didn't have first-hand knowledge of this information,

20   correct?

21   A.  I received it from Special Agent Middlebrooks.  Yes.

22   Q.  But you didn't get it from the confidential informant?

23   A.  Correct.

24           THE COURT:  You say he didn't have first-hand

25   knowledge of it.  I suppose nobody had first-hand knowledge of

 1   it except for the confidential source.

 2              MS. KUBINIEC:  That's what I'm asking him.

 3              THE COURT:  Okay.

 4              MS. KUBINIEC:  Did he discuss it with the

 5   confidential source.

 6              THE COURT:  Yeah.  He's already said he didn't.

 7              MS. KUBINIEC:  Okay.

 8   BY MS. KUBINIEC:

 9   Q.  In the last sentence of paragraph 2A, you state the

10   confidential source positive identified an unmarked

11   photograph of Robert Hernandez.  Did he identify that in your

12   presence?

13              MS. HIGGINS:  Objection, Judge.  He just said that he

14   never spoke to the CI.

15              THE COURT:  Different question.  Overruled.

16              THE WITNESS:  No.

17   BY MS. KUBINIEC:

18   Q.  So that somebody else told you that as well?

19   A.  Special Agent Middlebrooks told me that the confidential

20   source did positively identify the vehicle and the person of

21   Robert Hernandez.

22   Q.  And the information that you set forth in paragraph 2C,

23   on the second page of your affidavit, concerning the

24   inconsistencies in the stories of the travel destination and

25   between the operator and the passenger, that information you

1    didn't know personally either; is that correct?

2    A.  It was relayed to me by the deputies I was on the phone

3    with.

4    Q.  Okay.  But you didn't speak with either the passenger or

5    the operator of the vehicle?

6    A.  No.  I was given this information on site.

7    Q.  Deputy, when you made this search warrant application and

8    swore to the truth of the contents of it, you knew that Judge

9    Debra Givens would rely upon your information; is that

10   correct?

11   A.  Yes.

12   Q.  Did you testify in front of her?

13   A.  I did.

14   Q.  Okay.  You testified to the contents of this affidavit?

15   A.  Yes.

16   Q.  And when you testified in front of her, that was also

17   sworn testimony; is that correct?

18   A.  Yes, ma'am.

19   Q.  And you didn't tell her that this information was -- when

20   you said it was based on your knowledge as an affiant, you

21   didn't tell her that it was second-hand information; is that

22   correct?

23   A.  I told her it was information that I received.

24   Q.  Well, you didn't say it.  You didn't tell her that you

25   didn't receive it from the confidential human source, did

1    you?

2            MS. HIGGINS:  Objection, Judge.  There's nothing in

3    the record about that.  She has to ask what he told her.

4            THE COURT:  Overruled.

5            THE WITNESS:  Ask that again, please.

6    BY MS. KUBINIEC:

7    Q.  You didn't tell the judge, Judge Givens, that the

8    information in your affidavit was received from a different

9    person not the confidential source?

10           MS. HIGGINS:  Judge, objection.  Assuming facts not

11   in the record.

12           THE COURT:  Overruled.

13           THE WITNESS:  Before, I stated, when I said your

14   affiant, the way I put it was, as in your affiant, it was me

15   and Special Agent Curtis Middlebrooks sitting down, going

16   through this, and that's how I put it in there.

17   BY MS. KUBINIEC:

18   Q.  You told that to the judge?

19   A.  No.  This is not at all -- it's not what I said at all.

20   Q.  Okay.  So, you just said what's here in the affidavit?

21   A.  What I said was, your affiant.  I explained it *in camera*,

22   which is what it's called, that information was received

23   through an FBI task force to and include the Erie County

24   Sheriff's Office that this information is truthful.

25   Q.  But you didn't know it to be truthful?

1          MS. HIGGINS:  Objection, Judge.  He testified on

2    direct that what he put in this affidavit he believed to be

3    the truth at the time when he made it.

4          THE COURT:  Overruled.

5          THE WITNESS:  Ask again, please.

6    BY MS. KUBINIEC:

7    Q.  You didn't know this information was truthful?  You

8    personally did not know whether this information was

9    truthful?

10   A.  The information I received I believed to be truthful.

11   Q.  But you didn't know it.

12         THE COURT:  Okay.  You're arguing with him now.

13         MS. KUBINIEC:  Okay.

14   BY MS. KUBINIEC:

15   Q.  And it was your testimony that just yesterday you learned

16   from the government that this information about the

17   confidential source was not -- concerning observing Hernandez

18   transporting and distributing narcotics while inside the 2019

19   Honda Odyssey on numerous occasions, that that information

20   was not true?

21         MS. HIGGINS:  Objection, Judge.  He didn't testify

22   that it was yesterday.

23         THE COURT:  Sir, can you please step down and go out

24   in the hallway?  I need to talk to the lawyers for a second,

25   okay?

```
 1              THE WITNESS:  Yes, sir.

 2   (The witness left the room at 1:14 p.m.)

 3              THE COURT:  I'm confused.  What is not true in this

 4   paragraph?

 5              MS. HIGGINS:  So, Judge, first -- Judge that first

 6   sentence in paragraph 2, subsection A, your affiant had

 7   received information from a reliable confidential source.  So

 8   that representation that your affiant, meaning the deputy,

 9   received it from the confidential source.  He received the

10   information from Agent Middlebrooks who had direct contact

11   with the confidential source.

12              THE COURT:  So, that's what we're debating here?

13              MS. HIGGINS:  That's one of them.  And then, the

14   second, Judge, what I flagged at the outset, was when he

15   stated that the confidential source has observed Hernandez

16   transport and distribute narcotics while inside the 2019 Honda

17   Odyssey on numerous occasions.

18      So, he misunderstood or conflated materials that Agent

19   Middlebrooks had told him that the confidential source had

20   told him.  And his understanding, when he made this affidavit,

21   was that Hernandez -- that the confidential source had

22   observed Hernandez in the van.  That was not true.  The rest

23   of it was in fact --

24              THE COURT:  Now, you're losing me here.

25              MS. HIGGINS:  I'm sorry, Judge.
```

1          THE COURT:  What is not true?  Is it true that a

2   confidential source observed him transport and distribute

3   drugs?  Is that --

4          MS. KUBINIEC:  No.  That's not true, Your Honor.

5          THE COURT:  Hang on please.

6          MS. KUBINIEC:  Your Honor, that's --

7          THE COURT:  Please hang on, okay?

8          MS. KUBINIEC:  I'm sorry.  I'm sorry.  I apologize.

9          MS. HIGGINS:  Judge, that sentence that you just

10   read, that specific sentence, that was not factually accurate.

11   So, the confidential source had not observed Hernandez in the

12   van that they stopped with drugs.  That was the one sentence.

13   And maybe it would be helpful, and I defer to the Court, we

14   could have the deputy go through sentence-by-sentence to

15   identify what was accurate and not accurate.  That's the one

16   sentence that was not accurate.

17     I communicated that to Deputy Granville on Monday.  He

18   affirmed that that was the first time that he had ever heard

19   that that was not an accurate statement.  And so, that is what

20   I brought out on direct, that that's when he learned it.  So,

21   when he submits this, that statement he believed to be true at

22   the time based on the communication -- or the information that

23   Agent Middlebrooks had communicated to him.

24          THE COURT:  But this sentence isn't true?

25          MS. HIGGINS:  That's correct.  So, it was an error on

1    his part.  It was a misunderstanding on his part.  That

2    factual statement is not true, and he just found out about it.

3    But when he drafted the affidavit, he believed that to be

4    true.  It was his understanding that that was true.

5           THE COURT:  Okay.  Ms. Kubiniec, I'll hear from you

6    now.  Please step up to the microphone and speak in the

7    microphone.

8           MS. KUBINIEC:  Your Honor, that's just what I was

9    trying to establish; that that sentence is not true and that

10   even though --

11          THE COURT:  Well, it wasn't clear to me whether you

12   were trying to establish that the sentence wasn't true --

13          MS. HIGGINS:  Right.

14          THE COURT:  -- or whether it wasn't true; that a

15   confidential informant told him --

16          MS. HIGGINS:  Right.

17          THE COURT:  -- that information.  But, my

18   understanding now, is that this sentence isn't true.

19          MS. HIGGINS:  So -- but he gets this information

20   about -- all of the information about the CI, he gets from

21   Agent Middlebrooks, not from the CI.  He does not talk to the

22   CI before he drafts this.  So, his information about what the

23   CI says is from the agent.  And so, the issue that lead

24   defense counsel is trying to get is where it says, your

25   affiant had received information from a reliable confidential

 1  source.

 2          THE COURT:  I'll be honest with you, this doesn't

 3  bother me so much because, indirectly, he got the information

 4  from the --

 5          MS. HIGGINS:  Correct, judge.

 6          THE COURT:  But this other sentence --

 7          MS. HIGGINS:  That was the --

 8          THE COURT:  -- that's not true?

 9          MS. HIGGINS:  That is not true.

10          THE COURT:  Okay.

11          MS. HIGGINS:  At the time he drafted it, he believed

12  it to be true.

13          THE COURT:  Okay.  Ms. Kubiniec?

14          MS. KUBINIEC:  I was just trying to make the point,

15  Your Honor -- two points with regard to that sentence; one,

16  was that --

17          THE COURT:  Okay.  When you say that sentence, which

18  sentence are we talking about?

19          MS. KUBINIEC:  The --

20          THE COURT:  Are we talking about the confidential

21  source has observed?  Okay.  Go ahead.

22          MS. KUBINIEC:  Yes.  That's it.  I was just trying to

23  make two points.  The first point was that it, in fact, is not

24  true; that the confidential source did not observe those.

25          THE COURT:  And the government admits that.

1           MS. HIGGINS:  And we stipulate to it, Judge.

2           MS. KUBINIEC:  Yes.

3           THE COURT:  All right.

4           MS. KUBINIEC:  And --

5           THE COURT:  What's the second point?

6           MS. KUBINIEC:  The second point was just that

7    wherever that information came from, Granville didn't get it

8    directly from the confidential source.

9           THE COURT:  Okay.  Well, all right.

10          MS. KUBINIEC:  That's it.  I can stop asking him

11   questions if the Court understands that.

12          THE COURT:  I understand that.

13          MS. KUBINIEC:  Okay.  Have the witness come back in

14   please and you are done?

15          MS. KUBINIEC:  I'm just --

16          THE COURT:  Okay.

17          MS. KUBINIEC:  -- looking for at my notes briefly.

18   (The witness entered the room at 1:20 p.m.)

19          THE COURT:  You're still under oath, sir.

20          THE WITNESS:  Yes, Judge.

21   BY MS. KUBINIEC:

22   Q.  Deputy, have you discussed your testimony today with the

23   other officers in this case, officer -- Deputy Reeves and

24   Deputy Szkatulski?

25   A.  We had a brief meeting today but, no, I didn't discuss

1    with them what my testimony was going to be.

2    Q.  Okay.  But you were out there all together talking

3    together outside the courtroom, correct?

4    A.  Yes.

5    Q.  Okay.  And you obviously discussed this matter with the

6    government attorney, correct?

7    A.  Yes.

8         MS. KUBINIEC:  That's all I have for this witness,

9    Your Honor.

10         MS. HIGGINS:  Judge, I just have one brief redirect.

11         THE COURT:  Sure.

12

13                    REDIRECT EXAMINATION

14

15   BY MS. HIGGINS:

16   Q.  Before you drafted your affidavit, had you ever met the

17   confidential source?

18   A.  Yes.

19   Q.  How many times?

20   A.  Between maybe 5 and 10.

21   Q.  Before you drafted the affidavit in this case?

22   A.  Yeah.

23   Q.  And the information you received from the affidavit that

24   day came from Agent Middlebrooks; is that correct?

25   A.  Yes.

 1          THE COURT:  Sir, this sentence in your affidavit, the

 2   confidential source has observed Hernandez transport and

 3   distribute narcotics while inside the 2019 Honda Odyssey on

 4   numerous occasions, you're stating -- you testified now that

 5   that wasn't a true statement?

 6          THE WITNESS:  At the time, Judge, if I can explain if

 7   that's okay with you?

 8          THE COURT:  Sure.

 9          THE WITNESS:  At the time when I received this

10   information, the confidential source met.  There was a bunch

11   going on and the confidential source met a bunch of times with

12   the -- Mr. Hernandez.  And when the 2019 Odyssey -- all this

13   was identified.  I took it as it was previous narcotic

14   transactions, but it wasn't.

15          THE COURT:  So, you correct me.  So, what you're

16   saying is, you misunderstood what the confidential source told

17   you?

18          THE WITNESS:  Exactly.  Yes.

19          THE COURT:  And that was directly from the

20   confidential source?

21          THE WITNESS:  That was from Special Agent

22   Middlebrooks.

23          THE COURT:  Okay.

24          THE WITNESS:  To --

25          THE COURT:  Telephone thing, right?

1          THE WITNESS:  Through telephone and face-to-face.

2          THE COURT:  All right.  So -- well, the confidential

3    source told Agent Middlebrooks whatever.  He told you what you

4    thought was this, and that's why you put it in there?

5          THE WITNESS:  Yes, Judge.

6          THE COURT:  Now you know that that wasn't true?

7          THE WITNESS:  Exactly.

8          THE COURT:  Okay.  Anything further from anybody?

9          MS. HIGGINS:  Just one question, Judge --

10          THE COURT:  Sure.

11          MS. HIGGINS:  -- if I can do it here.  Is every other

12    sentence in this paragraph -- and Judge, if you indulge me, I

13    can read them, or if that's a good enough description for you,

14    that's fine.

15          THE COURT:  That's good enough for me.

16          MS. HIGGINS:  Okay.

17    BY MS. HIGGINS:

18    Q.  Is every other sentence in paragraph 2A accurate to the

19    best of your knowledge as you sit here today?

20    A.  Yes.

21          MS. HIGGINS:  No further questions.

22          THE COURT:  Ms. Kubiniec?

23

24

25

                        RECROSS-EXAMINATION

 1

 2

 3  BY MS. KUBINIEC:

 4  Q.  Well, it would be exception of the first sentence.

 5  That's not accurate.

 6        MS. HIGGINS:  Judge, this has been asked and answered

 7  several times.

 8        THE COURT:  Overruled.

 9        MS. KUBINIEC:  Well, you just asked this.

10  BY MS. KUBINIEC:

11  Q.  The first sentence is also not accurate.  Your affiant

12  received this information from a confidential human source.

13  That's not accurate?

14  A.  When I put in that your affiant, what I was doing is,

15  based the information received by me and Mr. Middlebrooks,

16  that that's the way I put it in there.  If I mistook or

17  accidentally put in your affiant, I should have put it a

18  different way.

19        MS. KUBINIEC:  I'm just clarifying what counsel said

20  over here.

21        THE COURT:  Anything further?

22        MS. KUBINIEC:  No.

23        THE COURT:  You can step down, sir.  Thank you.

24  (The witness left the room at 1:24 p.m.)

25        THE COURT:  Ms. Higgins?

1           MS. HIGGINS:  Judge, that's all we have.

2           THE COURT:  Okay.

3           MS. HIGGINS:  Thank you.

4           THE COURT:  Ms. Kubiniec?

5           MS. KUBINIEC:  That's all.

6           THE COURT:  Okay.  All right.  Normally, it takes

7  about 30 days to get the transcript, so we'll count on that.

8           THE CLERK:  Thirty days will take us to July 21st,

9  approximately.

10          THE COURT:  And then we'll do simultaneous briefing

11  two weeks.

12          THE CLERK:  August 4th.

13          THE COURT:  And then we'll do simultaneous responses,

14  two weeks.

15          THE CLERK:  August 18th.

16          THE COURT:  And then we'll have oral argument.

17          THE CLERK:  August 28th at 1 o'clock.

18          MS. HIGGINS:  That's fine for the government.  Thank

19  you.

20          THE CLERK:  Thank you.

21          THE COURT:  Okay.  Anything further today?

22          MS. HIGGINS:  Nothing further, Judge.  Thank you.

23          MS. KUBINIEC:  No, Your Honor.

24          THE COURT:  Ms. Kubiniec?  All right.  Have a good

25  rest of the day.

1              MS. KUBINIEC:  Thank you.  You, too.

2              THE COURT:  Thank you, Raida.

3              INTERPRETER:  You're welcome, Judge.

4    (Proceedings concluded at 1:25 p.m.)

1          CERTIFICATE OF TRANSCRIBER

2

3          In accordance with 28, USC, 753(b), I certify that

4     this is a true and correct record of the proceedings held in

5     the United States District Court for the Western District of

6     New York before Honorable Magistrate Judge Michael J. Roemer

7     on June 18th, 2025

8

9

10                              s/ Megan E. Pelka, RPR

11                              Megan E. Pelka, RPR

12                              Transcriber

13

14

15

16

17

18

19

20

21

22

23

24

25